# IN THE COURT OF APPEALS OF IOWA

---

No. 25-0738
Filed May 13, 2026

---

**In re the Marriage of Jessica M. Kirkpatrick and Kristopher K. Kirkpatrick**

Upon the Petition of
**Jessica M. Kirkpatrick,**
Petitioner–Appellant,

And Concerning
**Kristopher K. Kirkpatrick,**
Respondent–Appellee.

---

Appeal from the Iowa District Court for Cedar County,
The Honorable Mark R. Lawson, Judge.

---

**REVERSED AND REMANDED**

---

Jennie L. Clausen of H.J. Dane Law Office, Davenport, attorney for
appellant.

Thomas J. Viner of Viner Law Firm, P.C., Cedar Rapids, attorney for
appellee.

---

Considered without oral argument
by Greer, P.J., and Schumacher and Chicchelly, JJ.
Opinion by Greer, P.J.

1

**GREER, Presiding Judge.**

In September 2024, Jessica Kirkpatrick applied for a rule to show cause to find Kristopher (Kris) Kirkpatrick in contempt of court for not complying with the decree of dissolution of marriage visitation terms for their child, born in 2015. According to Jessica, Kris "willfully and deliberately violated the decree as it pertains to transporting and allowing the minor child to attend" various sporting activities, including baseball, soccer, and flag football over the course of 2022 through 2024.

The district court found that Kris's failure to present the child for some, but not all, of the child's scheduled extracurricular events did not rise to the level of willfulness despite the decree providing Jessica the unilateral right to schedule sporting events during Kris's scheduled parenting time. Finding that Jessica had not shown willfulness beyond a reasonable doubt to support a finding of contempt of court, the district court dismissed the application and denied Jessica's request for attorney fees. Jessica appeals from that ruling and requests payment of her appellate attorney fees supported by an affidavit from counsel. Kris also requests appellate attorney fees but has not filed an affidavit supporting that request.

We find Jessica established beyond a reasonable doubt that Kris willfully violated the decree, thus proving he was in contempt of the court order. For that reason, we reverse and remand this matter to the district court for the court to enter an order in accordance with this opinion. We further award Jessica trial attorney fees and her appellate attorney fees as described herein.

## I. Background Facts and Proceedings.

To resolve the dissolution of their marriage, in August 2020, the parties agreed to and filed a stipulation setting out various terms. That stipulation was approved and made an order of the court on August 21, 2020. Related to the issues here, the stipulation confirmed that the "[r]ights and responsibilities of joint legal custody include, but are not limited to, equal participation in decisions affecting the child's . . . extracurricular activities" and included language that the parties should have "an attitude of cooperation and mutual respect." Further, the stipulation noted that the visitation for Kris was to be reasonable and liberal and in the minimum amount as specifically set out in the document. That specific visitation schedule provided Kris parenting time, at a minimum, every other weekend from 6:00 p.m. on Friday until 6:00 p.m. on Sunday and every Wednesday from 5:00 p.m. until 8:00 p.m. Part of the stipulation specifically addressed the scheduling of the child's recreational activities, including sport participation. That section provided:

> The parties shall consult with one another before involving the child in recreational activities and the ultimate final decision on such enrollment shall be [Jessica's]. Upon the parties reaching an agreement to incur such expenses or purchase such equipment, the expenses shall be paid 100% by [Jessica]. In the event there is no agreement, then the parent choosing to incur the expense shall assume the financial responsibility for such expense.

> The school, extra-curricular, sports, drama, and musical activities of the child shall be paramount and both parties agree that if the child is with him/her or is scheduled to be with him/her at the time of such an activity, he/she will cooperate in providing transportation and allow the child to attend the activity. Approval of the child's requests for the scheduling of social activities shall be deferred to the parent who has care of the children at the time the requested activity is to be conducted.

After the dissolution of marriage was final, the paragraph related to extracurricular activities became a source of friction between the parties. Jessica produced at the hearing on the rule to show cause application a detailed list of the child's missed practices and games starting around 2022 and continuing through October 2024. The list included three missed practices and seven missed games for the 2023 baseball season; a 2022 missed soccer picture session and soccer practice and a 2023 missed soccer practice; a 2024 missed baseball picture session, along with missing one batting practice and the pre-game warm-ups; and six missed flag football practices in 2024. As far as these missed activities were concerned, Kris notified the coaches the child would not be present but did not always notify Jessica.

As the child missed more activities, and because the issue was not resolved, in May 2024, Jessica's counsel contacted Kris indicating that if he declined to take the child to the activities, Jessica would proceed by filing an application for rule to show cause. But by September, matters broke down further and Kris proposed an ultimatum: "I have not and will not be agreeing to [the child] participating in any activities that you have scheduled during my parenting time until we can work together on a solution to make up visitation time." Jessica applied for a contempt finding.

A contempt hearing was held, and both Jessica and Kris testified and offered numerous exhibits that were mostly email messages between the two related to the scheduling of the sports activities. The district court noted that "[w]hile many of [Jessica's] emails ask if Kris is supportive of [the child's] participation, she does not consider his input or the impact these activities will have on his limited time with [the child]." True, in the emails and at the hearing, Kris expressed his displeasure that the activities were often on his parenting time.

Kris also testified that he read the extracurricular section of the decree to mean that the "social activities," which he claimed would provide him deference, included "school, extra-curricular, sports, drama, and musical activities." Thus, he contended he was within the parameters of the decree by refusing to take the child to activities during his parenting time.

After the parties rested, the district court commented that Kris's reading of the decree and the stipulation was "not reasonable." And as to Jessica's unilateral right to make decisions that affected Kris's parenting time, the district court noted that "[i]f I could modify this decree today, I would, because that's wrong. But you both agreed to it."[1] Yet, the court confirmed that its "duty is to determine whether [Kris] followed the decree and the stipulation that [he] agreed to" and "determine whether [he] willfully violated the court order." The district court found there was no willful violation and dismissed the application. Jessica appeals.

## II. Standard of Review.

"A different standard of review exists on appeals from the trial court's refusal to hold a party in contempt under a statute that allows the trial court some discretion." *In re Marriage of Swan*, 526 N.W.2d 320, 327 (Iowa 1995). A district court has broad discretion, and "unless this discretion is grossly abused, the trial court's decision must stand." *Id.* (cleaned up). "We find such an abuse when the district court exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Schettler v. Iowa Dist. Ct.*, 509 N.W.2d 459, 464 (Iowa 1993). "'Unreasonable' in this context means not based on substantial evidence." *Id.*; *see also In re Marriage*

---

[1] The district court pointed out that the decree effectively unbundled one of the rights allowed under joint legal custody, "essentially grant[ing] Jessica sole legal custody," citing *In re Marriage of Frazier*, 1 N.W.3d 775, 779 (Iowa 2024). It acknowledged, however, that the parties agreed to this unbundling.

*of Hankenson*, 503 N.W.2d 431, 433 (Iowa Ct. App. 1993) ("When a trial court refuses to hold a party in contempt in a dissolution proceeding, our review is not de novo. Instead, we review the record to determine if substantial evidence exists to support the trial court's finding." (cleaned up)).

We consider whether the district court's ruling is supported by "such evidence as could convince a rational trier of fact that the alleged contemnor is guilty of contempt beyond a reasonable doubt." *Den Hartog v. City of Waterloo*, 891 N.W.2d 430, 435 (Iowa 2017) (citation omitted). "[T]he district court's conclusions of law do not bind us and we exercise unfettered review of the court's application of the law." *In re Marriage of Jacobo*, 526 N.W.2d 859, 866 (Iowa 1995).

### III. Analysis.

Iowa Code section 598.23(1) (2024) provides, in relevant part, if "a person against whom a temporary order or final decree has been entered willfully disobeys the order or decree, the person may be cited and punished by the court for contempt." Here, the district court framed the question as:

> A dissolution decree grants one parent the unilateral right to schedule sports activities for a child during the other parent's parenting time. The other parent objects and makes the child available for some— but not all—of the scheduled practices and games. Does this rise to the level of contempt of court?

We address that question under the standards applicable to a contempt action and then turn to the request for attorney fees.

**A. Contempt of Court.** To start, it was Jessica's burden to show that Kris "had a duty to obey a court order and willfully failed to perform that duty." *See Ary v. Iowa Dist. Ct.*, 735 N.W.2d 621, 624 (Iowa 2007). Kris concedes he did not always comply with the extracurricular activity provision

of the decree. But if "the party alleging contempt can show a violation of a court order, the burden shifts to the alleged contemner to produce evidence suggesting the violation was not willful." *Id.* So, Kris had the burden to show his violation was not willful. Because of the quasi-criminal nature of the proceeding, Jessica still retained the burden of proof to show willfulness beyond a reasonable doubt such that "even if [Jessica] makes a prima facie case and [Kris] does not produce any evidence, the court must still analyze [Jessica's] evidence to determine whether it establishes a willful violation beyond a reasonable doubt." *Jacobo*, 526 N.W.2d at 866.

Conduct becomes willful when it is "intentional and deliberate with a bad or evil purpose, or wanton and in disregard of the rights of others, or contrary to a known duty, or unauthorized, coupled with an unconcern whether the contemner had the right or not." *Id.* (citation omitted). Jessica needed to show only that some of the violations were willful to establish contempt. *See id.*

Turning to Kris's burden, he argued that he considered the sporting events under the category of "social activities" and thus, he could decide whether the child would participate. The district court rejected this reading, finding "[t]he stipulation is not vague or indefinite and Kris does not argue that he was *unable* to comply with the provisions." (emphasis in original). Additionally, Kris contended that the scheduled sports activities consumed a substantial portion of his quality time with the child; the district court was "sympathetic" to that position. The district court also observed that "although [Jessica] is the ultimate decisionmaker[,] more consultation with Kris would be beneficial. But Kris agreed to this [extracurricular] provision and the Court must enforce it unless and until it is modified. After all, Kris did agree that these activities are paramount." In the end, the district court found the failure to take the child to the missed activities was not done for a

bad or evil purpose, Kris had offered to exchange or reschedule times, he was mostly respectful in his emails, and the child attended the majority of the activities. Still, the district court characterized Kris's decisions to not take the child as "ill-advised."

Finding that Kris's behavior had not yet crossed into willfulness, the district court did instruct that Kris must take the child to games and practices unless Kris "has a very good reason not to do so." It also warned that as the child grows older, he might not get to play if he is not at practices, so Kris should "place [the child's] needs and desires ahead of those of he and his family." As another consideration, the district court opined that Kris's actions did not disregard Jessica's or the child's rights "as much as he advanced his own right to spend time with his child."

"There are two ways in which the contemner may show that a failure to comply with a court order was not willful: (1) the order was indefinite; or (2) the contemner was unable to perform the act ordered." *Christensen v. Iowa Dist. Ct.*, 578 N.W.2d 675, 678 (Iowa 1998). As the record stands, Kris did not show that the order was indefinite or uncertain, and there was no evidence that he was unable to perform. He understood that the stipulation allowed Jessica a unilateral right to schedule extracurricular activities for the child and that the parties agreed these activities "shall be paramount." As the court characterized it, Kris's reading of the decree terms was "unreasonable." And the stipulation did not include a provision to require make-up visitation based on missed parenting time because of an extracurricular activity, and Kris admitted as much.

Kris was questioned about the application of the extracurricular section of the decree:

> Q. . . . As to the scheduling, the stipulation says you shall consult but, ultimately, she gets to decide. Kris, does that mean she gets to pick the events, and sign him up for these events, and then if these are not social activities that you can defer on, you would have to take him to all the events? Is that your—
>
> A. Correct.
>
> Q. Okay. Do you agree with that?
>
> A. I do not.

Thus, even if the activities were not considered "social activities," Kris did not believe Jessica could make him take the child to the activity.

Jessica argues that Kris's behavior had escalated such that in the fall of 2024, the child missed every Wednesday evening flag football practice. Likewise, as evidence of the willfulness of Kris's violation of the court order, Jessica points to Kris's ultimatum that he would not say for certain that the spring 2025 soccer and baseball activities would work for him unless Jessica provided make-up visitation time. And one of the missed events occurred because, without any input from Jessica, Kris took the child to a shooting competition. But Kris testified that the activities were missed for a variety of reasons, including not having a schedule, having plans, being at weddings, being out of town, or taking trips for the child's birthday.

The email messages showed an effort by Kris to barter make-up visitation with attendance at the extracurricular activities. For example, in an April 2023 email message responding to Jessica, Kris stated, "Unfortunately, since you've been very uncooperative with my many requests for some extra time with [the child], we made plans. I was clear about that in my previous emails addressing soccer practice already." In

another email, Kris proposed that "[i]f the games/practices fall on my visitation time, I would be happy to get him there. The visitation time will have to be made up some other way. Please let me know your thoughts on that." Jessica responded, "There is no requirement to make up visitation time, as you are not losing any time with him. Instead, you have the opportunity to participate in watching the practice or game and attending it with him."

Certainly, a party may fail to follow a court order yet not have acted with the willfulness required to support a contempt finding. *See Farrell v. Iowa Dist. Ct.*, 747 N.W.2d 789, 791–92 (Iowa Ct. App. 2008) (finding that the contemner was not in default for failing to pay extracurricular costs given the "mutually agreed-upon" opt-out provision in the decree). But as in *Farrell*, a person cannot avoid a willfulness determination by disobeying a court order as a means "to get his wife's attention on joint parenting issues." *Id.* at 791. "Self-help" measures will not be a basis for avoiding a contempt finding. *Id.*

Even after considering the discretion provided to the district court, on our review of the record, we cannot find that substantial evidence supports the district court's dismissal of the rule to show cause application. Instead, we find Jessica established by proof beyond a reasonable doubt that Kris willfully violated the court order related to attendance at extracurricular activities. While the district court was sympathetic to Kris's position such that it found his purpose was not evil or bad, willfulness can be shown when a person acts contrary to a known duty, coupled with an unconcern whether he had the right or not. *See Hankenson*, 503 N.W.2d at 433. Kris's email messages and his posturing for make-up time not provided for in the decree show his defiance of the terms of the court order. In line with that reasoning, Kris failed to show the order was indefinite or uncertain such that he was

excused from abiding by its terms, as the district court made specific findings that Kris's interpretation at the hearing was unreasonable and that the terms in the stipulation were not "vague or indefinite." *See In re Marriage of Anderson*, 451 N.W.2d 187, 191 (Iowa Ct. App. 1989) ("The failure to adhere to an unclear or ambiguous decree may defeat a finding of contempt."); *see also Jacobo*, 526 N.W.2d at 866 (noting the only defense other than absence of willfulness is the uncertainty of the order).

Finding no ambiguity in the language, we find that Kris has not met his burden to show a lack of willfulness, and that Jessica proved beyond a reasonable doubt that Kris willfully disobeyed the court order on several occasions. At the hearing, Jessica did not request any remedy other than compliance with the decree, so we remand for the district court to order Kris to follow the terms of the decree going forward or risk further consequences in a subsequent rule to show cause proceeding.

We also note that the stipulation emphasized the parties should act with mutual respect, encourage maximum involvement of both parents in the child's life, and that the time parameters of Kris's visitation were set out as minimal terms. As with all families, the best interests of the child require that parents cooperate and treat each other with mutual respect while putting the child's interests before the personal interests of the parents, as the decree provided. The district court correctly identified the parties' dispute as one centered around control, and to avoid that characterization, flexibility should be the rule, not the exception. Hopefully each parent can recognize the benefit of that directive.

**B. Trial Attorney Fees.** Jessica requested trial attorney fees in the amount of $5,824. Given our reversal of the district court decision, we find Jessica is entitled to trial attorney fees in the amount of $2,912. Iowa Code

section 598.24 permits an award for attorney fees when the court determines a party is in contempt of a dissolution decree. Given the circumstances here, Kris should be required to pay a portion of the trial attorney fees for Jessica.

C. **Appellate Attorney Fees.** Jessica also requests appellate attorney fees in the amount of $4,632. As an appellate court, we have discretion to award or not award attorney fees, and when doing so, we consider the needs of the party requesting fees, the other party's ability to pay, and the merits of the appeal. *See In re Marriage of McDermott*, 827 N.W.2d 671, 687 (Iowa 2013). No record was provided that would allow us to weigh the parties' ability to pay. In the attorney-fee-award analysis of what is fair and reasonable, we look to the parties' financial positions. *See In re Marriage of Muelhaupt*, 439 N.W.2d 656, 662–63 (Iowa 1989). Therefore, we are reluctant to award the full request. But, considering the merits of the appeal and the fact that Jessica prevailed, we order Kris to pay $2,500 toward the appellate attorney fees Jessica incurred. We decline to award Kris appellate attorney fees.

**REVERSED AND REMANDED.**